**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jose Sanchez,<br><br>    Plaintiff,<br><br>v.<br><br>Abbott Laboratories,<br><br>    Defendant. | No. CV-18-02514-PHX-SMB<br><br>**ORDER** |

Pending before the Court is Defendant Abbott Laboratories' Motion for Summary Judgement and Memorandum of Points and Authorities, (Doc. 55, "Mot."). Plaintiff Jose Sanchez responded, (Doc. 64, "Resp."), and Defendant replied, (Doc. 69, "Reply"). The Court held oral argument on January 24, 2020 and enters the following Order:

## I. BACKGROUND

Jose Sanchez ("Plaintiff") works the nightshift as a maintenance technician at Abbott Laboratories ("Abbott" or "Defendant"),[1] a global healthcare company that, among other things, manufactures nutritional products Similac, PediaSure, and Ensure. (Doc. 55-1, "Smith Decl." ¶ 2.) Abbott employ Plaintiff at a facility ("Casa Grande") that manufactures both liquid and powder-form nutrition in Casa Grande, Arizona. (*Id.*) At Casa Grande, four maintenance teams work twelve-hour shifts. (*Id.* ¶ 4.) The teams—titled A1, A2, B1, and B2—are composed of six to eight technicians led by a direct supervisor known as a "Front Line Leader." (*Id.*) Teams A1 and B1 work dayshift; A2 and B2 work nightshift.

---
[1] Plaintiff remains an Abbott Maintenance Specialist to this day. (Mot. at 1; Resp. at 8.)

(*Id.*) Plaintiff joined supervisor Ricardo Pinales A2 nightshift in 2016.[2] (*Id.*) In both 2016 and 2017, Plaintiff requested transfer to recently vacated dayshift positions on the A1 shift supervised by Danny Burnett. (*Id.*) Each position, including Plaintiff's, was a Grade 7 position. (*Id.* ¶ 20.) The positions differed in two ways—the opposing schedules and the additional pay attached to nightshift positions.[3] (*Id.*)

Citing other applicants' greater expertise, superior performance evaluations, and considering various complaints about Plaintiff's performance from co-workers and supervisors, Abbott declined Plaintiff's transfer requests and selected other maintenance specialists on each occasion. (Doc. 55-3, Burnett Decl. ¶¶ 8-9, 19.) Plaintiff now challenges these personnel decisions and alleges national origin discrimination in violation of 42 U.S.C. § 1981 and 42 U.S.C. 2000e-2(a). (Doc. 1, "Complaint".)

### a. Plaintiff's Performance and Role at Abbott Laboratories

As one of Abbott's "Maintenance Specialists," Plaintiff is responsible for a variety of maintenance tasks. Among other duties, Maintenance Specialists repair the Casa Grande facility, conduct Demand and Preventative Maintenance ("DM" and "PM"), troubleshoot equipment, and conduct equipment safety and compliance tasks. (Smith Decl. ¶ 7.) In addition to relevant technical knowledge necessary to mitigate possible negative effects on production, Abbott demands a high degree of teamwork and responsiveness from Maintenance Specialists. (Burnett Decl. ¶ 8.) Accordingly, Abbott considers timely completion of mandatory trainings on compliance and documentation procedures essential to Plaintiff's position. (*Id.*) Abbott's Maintenance Specialists develop expertise in two general equipment categories—equipment used to manufacture liquid products (*e.g.* Ensure and Pediasure) and equipment used to make powder-based products (like Similac). Plaintiff primarily maintained equipment on Abbott's "liquid lines" and had only limited experience with the "dryer line"—equipment used to manufacture powder products. (Burnett Decl. ¶ 8.)

---

[2] Under Abbott's previous shift schedule, Plaintiff worked from 3 p.m. to 11 p.m. on the "second shift" under supervisor Lucas Hyne. (Doc. 55-1, "Smith Decl." ¶ 4.)
[3] Nightshift positions earn from $0.90 to $1.40 per hour more than identical dayshift positions. (Smith Decl. ¶ 20.)

Abbott contends its performance evaluation process and rating system substantiate the validity of the personnel decisions at issue here. Abbott evaluates and measures a technician's performance using Key Performance Indicators ("KPIs"). (Smith Decl. ¶ 10.) Calculated monthly, KPIs are composite scores with a ceiling of 100% that weigh a dozen different objective performance metrics—including utilization rates and DM and PM completion rates. (*Id.*) These monthly scores, in turn, are rolled into an annual performance evaluation completed by a technician's direct supervisor. (*Id.* ¶ 12.) Also composite metrics, annual performance evaluations include a technician's annualized KPI score, attendance history, mandatory training completion rate, and customer service scores. (*Id.*) Technicians receive one of four ratings based on these scores: Exceeds Expectations ("EE"), Achieved Expectations ("AE"), Partially Achieved Expectations ("PA")[4], or Did Not Achieve Expectations ("NA"). (*Id.*)

Plaintiff received AE ratings in 2014 and 2015. (Doc. 55-4 at 199, "2014 Evaluation"; Doc. 55-5 at 208, "2015 Evaluation".) But these generally satisfactory reviews flagged future issues. In his 2015 evaluation, Plaintiff's supervisor Lucas Hyne counseled Plaintiff to improve his PM and utilization rates—scores which negatively affected his overall KPI—and further challenged him to acquire greater knowledge in other areas of the facility, specifically the dryer line. (2015 Evaluation, at 201, 204-05.) In the two years following these relatively benign reviews, multiple supervisors lodged various complaints regarding Plaintiff's increasingly poor performance and attitude. (*See* Doc. 55-17 (documenting multiple supervisors' complaints)). Michael Smith, Abbott's second-level Maintenance Manager at Casa Grande, noted Plaintiff's growing reputation for "mak[ing] excuses" after receiving negative reports from numerous individuals, including from Burnett and Pinales. (Doc. 55-7 at 20.) Of note, Plaintiff avoided "dryer work," complained when tasked to maintain Abbott's dryer line, and seemed unwilling to acquire new skills. (*Id.*) For Smith, Plaintiff had all the makings of a top mechanic, but lacked

---

[4] A mark of PA is defined as "Partially achieved expected overall results during the past year. Achieved behaviors in some competencies. Met some expectations but improvement is required before performance can be considered to have achieved expectations." (Doc. 55-5 at 10.)

dedication to do so. (*Id.* at 21.)

Plaintiff's objective performance tracked his diminishing professional repute. In 2016, Plaintiff received a PA rating. (Doc. 55-11, "2016 Evaluation".) Particularly concerning to his immediate supervisor Pinales, Plaintiff failed to complete seventeen mandatory compliance training by the training deadline. (*Id.* at 6.) Although the 2016 evaluation describes Plaintiff as a generally competent and reliable technician, it also notes attitude as an area of needed improvement. (*Id.* at 5.) Specifically, Pinales acknowledged that Plaintiff "struggled with the [significant] changes" to the maintenance department during 2016 but advised Plaintiff to "focus on his job and not what other techs are doing or the experience or capacity they have" because it was "beginning to irritate his peers." (*Id.*)

### b. The 2016 Position

In June 2015, Plaintiff applied for a position on Burnett's A1 dayshift following the resignation of a longtime technician who specialized in working on the dryer line. (Smith Decl. ¶ 16.) Seeking a candidate with similar expertise, Burnett reviewed thirty-nine applications, including Plaintiff's. (Burnett Decl. ¶ 8.) Burnett did not select Plaintiff, instead hiring Christopher Sanders. Sanders, also an Abbott maintenance technician, had nearly twenty years of experience operating or maintaining dryer systems at Abbott's Casa Grande facility. (*Id.* ¶¶ 8-9.) Plaintiff's experience amounted to a total of six months. (*See* Doc. 55-6 at 49:25-50:2.) Plaintiff assessed his knowledge in the area as a "2/5." (Doc. 55-15.) Aside from Sanders' dryer line expertise, Burnett was persuaded by the length of time working at the facility, recommendations from other supervisors, and personal observations of Sanders. (Burnett Decl. ¶¶ 8-9.) Burnett maintains he was unaware of any concerns over Sanders' attitude, but admits he does not review employees' personnel files or disciplinary records when assessing applicants.[5] (*Id.* ¶ 18.)

### c. The 2017 Positions

---

[5] While Burnett does review employees' KPI's, he apparently relies on supervisor recommendations to vet candidates for disciplinary issues or character concerns. (Burnett Decl. ¶ 21.)

- 4 -

Plaintiff applied to fill two additional dayshift vacancies in 2017. (Burnett Decl. ¶ 11.) Abbott's Talent Acquisition team shortlisted Plaintiff and five others—Schiltz, Porfiro, Foulks, Elbe, and Figueroa[6]—for the two positions. (*Id.* ¶ 11.) To further narrow the field, Burnett conducted panel interviews with the three other shift supervisors. (*Id.* ¶ 12.) Following the interviews, the three supervisors identified their top two candidates.[7] (*Id.*) Shiltz received two votes. Porfiro, Foulks, and Plaintiff each received one. (*Id.*) While discussing the candidates, B1 dayshift supervisor Ralph Diaz-Gonzalez advised against selecting Plaintiff. (*Id.* ¶ 13.) Diaz-Gonzalez critiqued Plaintiff's substandard teamwork and informed the Burnett that he had reported Plaintiff to employee relations recently due to a particularly negative interaction. (*Id.*; *see also* Doc. 55-8 at 5 (Abbott internal investigation recording Diaz-Gonzalez's complaints regarding Plaintiff's work ethic).) In addition to this feedback, Burnett considered the KPI ratings of the candidates from the current year (2017) to-date. (Burnett Decl. ¶ 15.) Burnett's assessment specifically emphasized each candidates' PM, DM, Scheduling, and Utilization scores. (*Id.* ¶¶ 15-16.) Plaintiff ranked fourth-best. (*See id.*) Recognizing that Elbe, the third-ranked candidate, had recently joined Abbott, Burnett included Plaintiff as one of the final three candidates for the two positions. (*Id.* ¶ 16.) This left Plaintiff, Foulks, and Schiltz as the three finalists for two positions. (*Id.*) Of the three, Plaintiff's KPI scores were the lowest.[8] (*See id.*) So was his 2016 annual evaluation mark. (*Id.* ¶ 18.) Before his final decision, Burnett "recalled" the candidates respective 2016 evaluation marks "from [a] 2016 annual performance chart [he] had reviewed earlier in 2017." (*Id.*; *see also* Doc. 55-13, "2016 Performance Evaluation Chart".) While both Foulks and Schiltz received AE marks in 2016, Plaintiff received a PA. (2016 Performance Evaluation Chart.) Considering their superior 2016 evaluations, higher KPI scores for the current year, and the lack of negative feedback about their applications, Burnett hired Foulks and Schiltz. (Burnett Decl. ¶ 19.)

### d. Procedural Background

---

[6] Including Plaintiff, half of the shortlisted applicants have Mexican heritage. (Mot. at 9.)
[7] One supervisor, Ignacio Hernandez, only provided his top choice. (Ex. 3 ¶ 12.)
[8] Plaintiff's KPI's were far marginally lower than Schiltz and far below Foulks. (Doc. 55-3 at 7.)

- 5 -

Plaintiff filed a charge of discrimination in August 2017 with the EEOC alleging Abbott denied him promotion due to his "national origin, Mexican." (Doc. 1-2 at 2.) Plaintiff then commenced this action on August 8, 2018 pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 2000e-2(a), alleging national origin discrimination or disparate impact. (*See generally* Complaint.) Plaintiff alleges four total counts related to Abbott's employment decisions—two relate to the 2015 position, and two for the positions in 2017. (*Id.*)

**II.     LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). The court need only consider the cited materials, but it may also consider any other materials in the record. *Id.* 56(c)(3). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 1056 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Id.* at 323–24.

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the movant fails to carry its initial burden, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*

*v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If the movant meets its initial responsibility, the burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact. *Id.* at 1103. The nonmovant need not establish a material issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). However, in the summary judgment context, the Court believes the nonmovant's evidence, *id.* at 255, and construes all disputed facts in the light most favorable to the nonmoving party, *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

### III. DISCUSSION

#### a. Procedural Viability of Plaintiff's Claims

Abbott flags procedural deficiencies in three of Plaintiff's four claims. As explained below, the Court finds dismissal of each identified claim proper.

##### i. National Origin Claims Under 42 U.S.C. § 1981

Plaintiff alleges national origin discrimination in violation of 42 U.S.C. § 1981. (Doc. 1.) Section 1981 forbids discrimination based on "ancestry or ethnic characteristics." *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); 42 U.S.C. § 1981. However, federal courts have no jurisdiction under § 1981 over claims based solely on national origin discrimination. *Foncesca v. Sysco Food Servs. Of Arizona, Inc.*, 374 F.3d 840, 850 (9th Cir. 2004); *see also Sanaga v. Tenorio*, 384 F.3d 731, 739 (9th Cir. 2004) (finding the reading that "§ 1981 does not protect against discrimination on the basis of *national origin*" to be "consistent with the Supreme Court's language and the plain

holdings of our sister circuits"); *Anooya v. Hilton Hotels Crp.*, 733 F.2d 48, 50 (7th Cir. 1984) (per curium) (emphasis in original); *Keating v. Carey*, 706 F.2d 377, 384 (2d Cir. 1983); *Bullard v. OMI Georgia, Inc.*, 640 F.2d 632, 634 (5th Cir. 1981). Although courts broadly construe claims of *racial* discrimination under § 1981 to cover immigrant ethnic groups, the claims here relate to treatment based upon Plaintiff's national origin, not his race or ethnicity.[9] *See Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003). Accordingly, Plaintiff's national origin discrimination claims are not actionable under § 1981 and must be dismissed. *See Fonscesca*, 374 F.3d at 850.

### ii. Title VII Claims

Under Title VII, a complainant must file charges with the EEOC within 180 days of the alleged discrimination, or 300 days if the complainant initiates proceedings with a state or local agency. 42 U.S.C. § 2000e-5(e); *see Green v. L.A. Cty. Superintendent of Sch.*, 883 F.2d 1472, 1473 (9th Cir. 1983). Plaintiff initiated his Title VII claim relating to the June 2015 position at least 673 days after clear notice of his non-selection.[10] The Court dismisses that claim as untimely.[11] Thus, only Plaintiff's Title VII claim relating to his application for dayshift positions in 2017 survives.

### b. Plaintiff's Prima Facie Case

To establish a prima facie case of national origin discrimination under Title VII a

---

[9] Plaintiff describes himself as "a person whose *national origin* is Mexican" and alleges Abbott "has engaged in . . . discrimination against persons whose nationality is Mexican." (Doc. 1 at 2-3.) Plaintiff does cite protection from *future* race discrimination, among other things, to justify a request for injunctive relief. But, even assuming the Complaint explicitly alleged racial discrimination, or discrimination premised on Plaintiff's ethnicity rather (as opposed to national origin), Plaintiff's claims fail as discussed *infra*.
[10] This generous count begins October 5, 2015, the day Sanders formally assumed the A1 dayshift position. (*See* Burnett Decl. ¶ 10.) Burnett maintains he informed Plaintiff of his non-selection in late July or early August. (*Id.* ¶ 9.)
[11] The Court notes that the failure to timely file an EEOC charge within the 300-day period is not a jurisdictional bar in a Title VII suit, but is rather "treated as a violation of a statute of limitations, complete with whatever defenses are available, such as equitable tolling and estoppel." *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000), *overruled on other grounds by Socop-Gonzalez v. I.N.S.*, 272 F.3d 1172, 1194-96 (9th Cir. 2001) (en banc). Here, Plaintiff makes no claim to support application of equitable tolling or estoppel, nor does the Court, viewing the evidence in the light most favorable to Plaintiff, find support for either in the record. *See Holmberg .v Armbrecht*, 327 U.S. 392, 397, 66 S. Ct. 582, 90 L.Ed. 743 (1946) ("[W]here a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered[.]").

plaintiff must show: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situation individuals outside his protected class were treated more favorably.[12] *Chuang v. University of California-Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000) (citing *McDonnell Douglas Corp., v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Fonseca v. Sysco Food Services of Arizona*, 374 F.3d 840, 850 (9th Cir. 2004) (determining that an employment discrimination claim under 42 U.S.C. § 1981 follows the legal principles applicable in a Title VII case). "The requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even rise to the level of preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). To rebut a prima facie case, Abbott must articulate some legitimate, non-discriminatory reason for the challenged action. *Chuang*, 225 F.3d at 1123-24. Assuming Abbott successfully rebuts the prima facie case, Plaintiff must then show the articulated reason is pretextual "either directly by persuading the court that the discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

To establish a prima facie case of national origin discrimination, an employee must suffer an adverse employment action. *Chuang*, 225 F.3d at 1124. Here, Plaintiff fails to demonstrate that Abbott's decision to decline his application to laterally transfer constituted an adverse employment action, dooming his prima facie case of national origin discrimination. The Ninth Circuit broadly construes adverse employment actions, holding that "a wide array of disadvantageous changes in the workplace" can constitute adverse employment actions. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). The definition covers a slew of employment decisions—termination, negative employment

---

[12] Even assuming Plaintiff's § 1981 claims survive, they are subject to the same burden-shifting analysis outlined in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Mustafa v. Clark County School Dist.*, 157 F.3d 1169, 1180 n.11 (9th Cir. 1998). If analyzed, Plaintiff's § 1981 claims fail for identical reasons as the remaining Title VII claim.

references, undeserved negative performance reviews, and denial of promotions qualify all qualify. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). But "not every employment decision amounts to an adverse employment action." *Id.; see also Vasquez v. County of Los Angeles*, 349 F.3d 643, 651 (9th Cir. 2004). "[M]ere inconveniences or an alteration of job responsibilities do not qualify." *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 532 (10th Cir. 1998); *see also Kortan v. State of Cal.*, 5 F.Supp.2d 843, 853 (C.D. Cal. 1998). Lateral transfers that do not materially alter an employee's responsibilities, pay, benefits or affect the terms of an individual's employment more readily fit this latter category. *See Scott v. City of Pheonix*, No. CV-09-0875-PHX-JAT, 2011 WL 3159166, at *6-7 (D. Ariz. July 26, 2011) (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886-87 (6th Cir. 1996)).

Here, Plaintiff's attempted transfers involved positions of equal grade and identical duties. Without some concomitant material change to the terms of employment, [13] Abbott's decision to decline Plaintiff's lateral transfer to an identical position on a different shift does not amount to an adverse employment decision. *See Felix v. City & County of Denver*, 729 F.Supp.2d 1243, 1261 (D. Colo. 2010) (holding a denial of a plaintiff's request to transfer to another unit does not constitute an adverse employment action under Title VII); *Lee v. Potter*, No. C 07-254, 2008 WL 4449568, at *9 (N.D. Cal. Oct. 1, 2008) ("As the terms and conditions of plaintiff's employment did not objectively change for the worse as a result of her lateral transfer tor defendant's denial of her requests, it was not an adverse employment action as a matter of law."). Indeed, despite the unsuccessful transfer applications, Plaintiff's employment as an Abbott Maintenance Specialist was unaffected. The failure to realize a desired transfer to a preferred position should not be equated with

---

[13] Although the Court recognizes a general preference for dayshift positions likely exists—and explains Abbott's offer of increased pay for night-shift positions as incentive for a comparatively disfavored shift schedule—the otherwise identical terms of employment persuade the Court the positions are properly considered lateral. *See Wu v. Pacifica Hotel Co.*, No. C 00-2059 SI, 2001 WL 492475, at *7 (N.D. Cal. April 25, 2001) ("There is no evidence to show that the change in shifts implicated anything more than [plaintiff's] preference. Standing alone, the shift change does not constitute adverse employment action.") (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 n.6 (9th Cir. 1994), *cert. denied*, 513 U.S. 1082 (1995)).

loss of a current position. *Del Castillo v. Wash. Dep't of Soc. & Health Servs.*, No. C05-1122JLR, 2007 WL2713035, at *8 (W.D. Wash. Sept. 14, 2007) (finding denial of a plaintiff's transfer request "did not constitute an adverse employment action because it was not disadvantageous change in the workplace, but a continuation of the status quo") (quotation marks omitted). Further, Plaintiff neither alleges nor infers any harm to his future employment prospects at Abbott (or in the job market generally) as a result of the Abbott's personnel decisions. Title VII only covers "employer actions that would have been materially adverse to a reasonable employee." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2406, 165 L.Ed.2d 345 (2006). Abbotts' personnel decisions here do not implicate any material change.

### c. Defendant had Legitimate, Nondiscriminatory Reasons for its Actions

Abbott also submits legitimate, nondiscriminatory reasons for the employment decision at issue and maintains that no rational juror could find these reasons were mere pretext concealing discrimination. The Court agrees.

Abbott's evidence of legitimate, non-discriminatory reasons for its personnel decisions is substantial. Concerning the 2015 position, Burnett's selected an employee for the dayshift vacancy with the departing employee, a "dryer line" specialist, in mind. Sanders was longer-tenured than Plaintiff and vastly more experienced in an area of need for the A1 dayshift. Plaintiff's six months of "dryer line" experience paled in comparison to Sanders' twenty years. Simply put, Sanders fit the specific needs Burnett required. This, Plaintiff does not rebut. Abbott's selections for the 2017 positions are similarly well-supported. Rather than indicative of latent bias, the record reflects that Plaintiff was seriously considered to fill both 2017 vacancies. However, Burnett's eventual selections—Foulks and Schiltz—outperformed Plaintiff by both objective and subjective measures. Both Foulks and Schiltz received AE's in 2016; Plaintiff earned a PA. (Burnett Decl. ₽ 18; 2016 Performance Evaluation Chart.) The successful applicants 2017 KPI scores were also superior to Plaintiff's. (*Id.* ₽ 19.) Finally, unlike Plaintiff, no supervisor spoke ill of either Foulks or Schiltz during the application review process. (*See* Doc. 55-30 at 69:12-17; 69:6-

8.) Even assuming Plaintiff established a prima facie case (he does not), Abbott meets its burden to show legitimate, nondiscriminatory reasons for its actions.

### d. Plaintiff Cannot Establish Pretext

Plaintiff has a countervailing burden to present evidence establishing that Abbott's legitimate, nondiscriminatory reasons for its selections, are pretext masking intentional discrimination. A plaintiff may establish pretext directly, by showing "that a discriminatory reason more likely motived the employer" or indirectly, by showing "that the employer's proffered explanation is unworthy of credence." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112-13 (9th Cir. 2011) (citing *Burdine*, 540 U.S. at 256, 101 S.Ct. 1089). This standard is "hardly an onerous one," *Noyes v. Kelly Services*, 488 F.3d 1163, 1170 (9th Cir. 2007), and the evidence is considered cumulatively. *Raad v. Fairbanks North Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003). That said, "[w]here evidence of pretext is circumstantial, rather than direct, the plaintiff must produce 'specific' and 'substantial' facts to create a triable issue of pretext." *Earl*, 658 F.3d at 1113 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).

Plaintiff believes five facts[14] establish the pretextual nature of Abbott's justifications for declining Plaintiff's transfer to a day-shift position.[15] (Resp. at 13-14.) He argues a pretextual inference is proper here because (1) unlike his competition, Plaintiff had no formal, negative counseling in his record; (2) his 2016 performance review was largely positive; (3) Abbott's development plan for Plaintiff made no mention of attitude concerns but rather focused on improving his technical skillset; (4) his supervisor, Burnett, hired zero non-Caucasian employees prior to Plaintiff's complaint of discrimination; and (5) workers jokingly referred to the day-shift as the "Aryan Nation" due to the preponderance of Caucasian day-shift workers. (*Id.*) None of this evidence generates a

---

[14] Plaintiff submits a litany of problematic evidence and statements. (*See* Reply at 10-11.) Abbott seeks to exclude this evidence as either (1) hearsay, (2) conclusory statements lacking foundation, or (3) sham testimony. (*Id.*) The Court finds an admissibility ruling unnecessary given the clear weight of the evidence against Plaintiff's position.
[15] Some of Plaintiff's evidence of pretext relates to claims either time-barred under Title VII or not actionable under § 1981. *See supra* 7-8. The Court addresses all pretextual evidence here for the sake of completeness.

genuine issue of material fact that Abbott's stated reasons for declining Plaintiff's request to transfer and instead, accepting more qualified applicants were pretextual. In fact, none of Plaintiff's circumstantial evidence of pretext addresses Abbott's proffered reasons for declining Plaintiff's transfer application.[16] *See Earl*, 658 F.3d at 1112-13.

Plaintiff first contends that, unlike both Sanders in 2015 and Schiltz in 2017, "no one ever wrote [Plaintiff] up for bad attitude or not helping out." (Resp. at 13.) Abbott does not dispute that Sanders and Shiltz previously received written counseling. (Reply at 6.)[17] But Plaintiff identifies no Abbott policy requiring review of formal written feedback, annual evaluations, or negative counseling statements in lateral transfer decisions. (*See* 55-10 ¶ 10.) The record instead establishes the opposite. Applicants' personnel files are not normally subjected to a searching review. (Burnett Decl. ¶ 21.) Nor were they here. Rather, Burnett's evaluation process was far more informal and discretionary. (*See id.* ¶¶ 15-19.) Largely, he relied on specific KPI scores and other supervisors' advice. (*Id.*) The decision to hire Sanders turned on superior dryer line qualifications. (*See* Doc. 55-6 at 49:25-50:2.) Burnett hired Shiltz due to his better KPI scores, Plaintiff's substandard 2016 evaluation and Plaintiff's increasingly poor reputation among supervisors. (Burnett Decl. ¶ 19.) Burnett did not consider negative "write-ups" of any candidate in either instance. (*Id.* ¶ 21.) Plaintiff does not explain how the allegedly negative "write-ups," not considered in the review process of any applicant, bears on this case.[18]

Plaintiff next argues his 2016 performance review was largely positive and "recognized him for doing everything his superior asked of him." (Resp. at 13.) The record belies this characterization. The 2016 evaluation, in some places, lauds Plaintiff's technical

---

[16] On at least a dozen occasions in the Response, Plaintiff's counsel misconstrues or misstates evidence in the record. Each example—helpfully addressed in Abbott's Reply—draws conclusions utterly unsupported by the record. (*See generally* Reply.) At oral argument, Plaintiff's counsel conceded to making "one typo" but otherwise maintained the propriety of each statement as "reasonable inference[s]." The Court seriously considers the abuse of the record as bordering on malpractice and entreats Plaintiff's counsel to carefully consider her duty of candor to the Court.
[17] Sanders received one written warning, (Resp., Exh. F), and one record of informal coaching, (Resp., Exhs. E, G). Schiltz also received informal coaching. (Resp. Exh. I.)
[18] Burnett attests he was unaware of Sanders' warning or informal coaching incidents prior to his selection for the 2015 position. (*See* Burnett Decl. ¶ 21; Burnett Dep. At 82:4-17.)

- 13 -

expertise in specific functional areas, but the evaluation equally highlights the shortcomings that precipitated Plaintiff's eventual 2016 rating of PA. (*Compare* 2016 Evaluation at 2 ("he has the knowledge and experience to become a multi-craft tech"); *and id.* at 5 ("He has a vast knowledge and experience and I will like to see more of [Plaintiff's] experience") *with id.* ("[Plaintiff] has struggled with the changes and needs to focus on his [j]ob and not what other techs are doing . . . it has come to a point that it is beginning to irritate his peers."); *and id.* at 6 (". . . he had 17 late training[s] this review period. This has allow[ed] his score to drop[] significantly. In [a]ddition, he had three occurrences this review period that dropped his score.")). Crucially, in considering Plaintiff for positions in 2017, Burnett only "recalled" the candidates' annual evaluation scores from a summary document he studied earlier that year. (Burnett Decl. ¶ 21.) Burnett expressly disavows reviewing the full evaluations of any applicant.[19] A pattern of recurs in the record as Plaintiff's self-image and Abbott's evaluation of Plaintiff diverge regularly. On multiple occasions, Plaintiff self-assessed as "Best in Abbott" while Abbott concluded: "Significant [or Some] Improvement Required." (*See e.g., id.* at 5 (Anticipate – Individual Contributor), 5-6 (Build – Individual Contributor), 6 (Deliver Results – Individual Contributor), 7 (Section Summary)). Plaintiff's cherry-picking of his 2016 evaluation does not hint at pretext.

The same is true of Abbott's development plan. Plaintiff infers that because the development plan focuses on improving Plaintiff's technical skills and not his "bad attitude," any evidence of Plaintiff's negative attitude is unsubstantiated and its later use as reason to decline Plaintiff's requested transfer pretextual. (*See* Resp. at 13.) That conclusion does not reasonably follow. The development plan was developed based largely on Plaintiff's self-assessment of his weaknesses,[20] (*see* Smith Decl. at ¶¶ 21-22; Doc. 55-15, "Development Plan Questionnaire"), and was designed to "help [Plaintiff] improve his skills, meet performance goals, and increase his chances for advancement into other roles."

---

[19] Plaintiff does not contest Burnett's assertion or provide evidence inferring the reviews were, in fact, considered.
[20] For this reason alone, the lack of explicit focus on Abbott's concerns over Plaintiff's attitude is unsurprising.

(Doc. 55-10, "Curcio Decl." at ¶¶ 4-6; Smith Decl. ¶ 21.) Plaintiff ignores that Abbott viewed his lack of interest in developing expertise in other areas of the facility—like the dryer line—as indicative of his "bad attitude."[21] (Resp. at 7, 13; *see also* Doc. 55-5 at 6.) Without harping on Plaintiff's deteriorating reputation, the development plan is a roadmap to help Plaintiff address these deficiencies that feed those fires. As Abbott's counsel summarized well at oral argument, no good deed goes unpunished. Again, Plaintiff's argument does not address any of the legitimate reasons for Abbott's personnel decisions and fails to establish pretext.

Plaintiff's fourth example is a broadly conclusory personal observation that "everyone Burnett hired before [Plaintiff] complained of discrimination was Caucasian." (Resp. at 14.) Statistical evidence can constitute circumstantial evidence of discrimination demonstrating pretext. *Cf. Bergene v. Salt River Project Improvement & Power Dist.*, 272 F.3d 1136, 1143 (9th Cir. 2001) (finding that the lack of female supervisors constituted circumstantial evidence of gender discrimination). Here however, Plaintiff's conclusory observation is "statistical evidence derived from an extremely small universe," of questionable accuracy,[22] and carries "little predictive value." *Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 663 (9th Cir. 2002) (quoting *Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072, 1076 (9th Cir. 1986)). Further, it fails entirely to account for possible nondiscriminatory variables—candidate pool, job performance, and employment qualifications. *Aaragon*, 292 F.3d at 663. Absent any analytical foundation, the Court declines to accord Plaintiff's conclusory statistical observation sufficient weight to establish pretext.

Lastly, Plaintiff points to his co-workers' joking characterization of the dayshift as the "Aryan nation." (Resp. at 14.) There is no nexus between Plaintiff's unsupported report of self-serving comments and the dayshift position at issue. *See Vasquez v. County of Los*

---

[21] Plaintiff's initial rejection of Abbott's offer to assist by creating the development plan for Plaintiff lends credence to these attitude concerns. (Doc. 64-1, "Curcio Dep." at 57: 22-25, 62:22-63:10.)

[22] Abbott points to two non-Caucasian hires on Burnett's shift, at least one of which was hired before Plaintiff lodged his EEOC complaint. (*See* Reply at 9, n.18.)

*Angeles*, 349 F.3d 643, 640 (9th Cir. 2004); s*ee also Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (holding that a comment unrelated to the plaintiff's termination was weak circumstantial evidence of discriminatory animus). Although inadmissible hearsay and lacking foundation[23], the comment does not speak to the relevant issue of national origin or is properly equated with a discriminatory remark from an Abbott supervisor or decision-maker. *Kohl v. Potter*, 225 F. App'x 582, 582 (9th Cir. 2007) (citing *Vazquez*, 349 F.3d at 640) ("A stray remark by a non-decisionmaker is not sufficient to create a material issue of fact.").

None of these arguments meet Plaintiff's burden. *See Chuang*, 225 F.3d at 1123-24. Plaintiff's evidence does not cumulatively raise a genuine issue of material fact regarding the truth of Abbott's proffered reasons for declining Plaintiff's lateral transfer requests. *See id.* at 1127. With no other evidence to rebut Defendant's evidence of legitimate, non-discriminatory reasons for their actions, this Court finds Plaintiff's evidence insufficient to survive summary judgment.

## IV. CONCLUSION

Accordingly,

1. **IT IS ORDERED GRANTING** Defendant Abbott Laboratories' Motion for Summary Judgment and Memorandum of Points and Authorities, (Doc. 55.)
2. **IT IS FURTHER ORDERED** the Clerk of the Court shall terminate this action and enter judgment accordingly.

Dated this 30th day of January, 2020.

Honorable Susan M. Brnovich
United States District Judge

---

[23] At oral argument, Plaintiff's counsel cited *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) to establish that hearsay evidence inadmissible at the trial stage should be properly considered at summary judgment. *Fraser*, in fact, holds that at summary judgement, a court does not focus on the admissibility of evidence's form, but on its contents. *Id.* Here, as an out-of-court statement offered for the truth of the matter asserted, the content of Plaintiff's evidence is inadmissible. *See Gleklen v. DCCC*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (finding at "sheer hearsay . . . counts for nothing" on summary judgment).